UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LORI DEW, et al., <br> Plaintiffs, <br> v. <br> CITY OF SEASIDE, et al., <br> Defendants. | Case No. 19-cv-06009-HSG <br><br> **ORDER GRANTING MOTION FOR SUMMARY JUDGMENT** <br><br> Re: Dkt. No. 49 |

As successors-in-interest of Brandon Virtue, Plaintiffs bring this suit against Seaside Police Chief Abdul Pridgen ("Pridgen") and former Seaside Police Officer Manuel Fernandez ("Fernandez") (collectively, "Individual Defendants") and the City of Seaside (together, "Defendants"), alleging claims under 42 U.S.C. § 1983 ("Section 1983") and various state law claims. Pending before the Court is Defendants' motion for summary judgment, briefing for which is complete. *See* Dkt. Nos. 49 ("Mot."), 51 ("Opp."), 52 ("Reply"). The Court held a hearing on the motion for summary judgment on March 4, 2021. Dkt. No. 56. Following the hearing, the Court directed the parties to submit supplemental briefing concerning Defendants' claim of qualified immunity. *See* Dkt. Nos. 63 ("PSupp.") and 64 ("DSupp."). For the reasons stated below, the Court **GRANTS** Defendants' motion as to all federal claims. The Court declines to exercise supplemental jurisdiction over Plaintiffs' remaining state law claims and **DISMISSES** those claims **WITHOUT PREJUDICE** to their reassertion in state court.

I.  **BACKGROUND**

This case arises from the shooting of Brandon Virtue by Manuel Fernandez on September 20, 2018, and Virtue's suicide on February 19, 2019. On September 19, 2018, Virtue was out on bail and subject to terms of release supervised by the Monterey Probation Department's Pretrial

Services Unit. Dkt. No. 51-1, Declaration of Jeremy Lessem ("Lessem Decl."), Ex. A, Deposition of Laudemer Palado ("Palado Dep.") at 26:21-27:10. On September 19, Probation Officer Palado learned of a call reporting that Virtue might be violating the terms of his release. *Id.* at 21:4-22:21. Probation Officer Palado met with Virtue's assigned probation officer, Probation Officer Balcazar, Probation Officer Nishimura, Probation Officer Massey, and their supervisor to develop "a safe plan to contact Mr. Virtue." *Id.* at 31:19-33:16; 36:20-37:7. The probation officers contacted Sand City Police Department ("Sand City") to debrief Sergeant Bushnell and further coordinate. *Id.* at 33:21-23; 37: 8-13; 40:25-41:14. That same day, Probation Officers Palado, Balcazar, Nishimura, and Massey met with Sergeant Bushnell, Commander Graziano, and another Sand City officer at the Sand City Police station and developed a plan to safely contact and detain Virtue. *Id.* at 42:21-49:24. Commander Graziano went to the target location, but the plan changed when Virtue unexpectedly left and got into his SUV and drove off before officers could approach him. *Id.* at 53:1-18.

Officers tried to initiate a traffic stop, but Virtue did not pull over. Dkt. No. 49-1, Ex. A ("Dashcam Video"); Lessem Decl., Ex. M ("Guzman Sanchez Expert Clarification"). Five law enforcement vehicles began pursuing Virtue. Palado Dep. at 58:19-59:10. Sand City was leading the pursuit and was communicating over the radio. *Id.* at 59:1-10; 60:10-21. Then-Seaside Police Officer Defendant Fernandez was at Seaside High School on an unrelated call when he learned of Sand City's pursuit over his radio. Dkt. No. 62-1, Deposition of Defendant Fernandez ("Fernandez Dep.") at 39:5-10; 43:3-23. Defendant Fernandez decided to join the pursuit without communicating with other officers. *Id.* at 49:22-50:14; 52:15-21; 55:13-56:4.[1]

Defendant Fernandez first saw Virtue's SUV as it was being pursued by Sand City near the intersection of Fremont and Monterey Road. *Id.* at 62:15-20; 66:10-17. Defendant Fernandez joined the pursuit without any knowledge of why Sand City was conducting a traffic stop or who the driver was. *Id.* at 94:4-13. Defendant Fernandez positioned his police cruiser in front of

---

[1] Plaintiffs contend that Defendant Fernandez joined the pursuit without invitation and in violation of Seaside Policy, *see* Opp. at 7, but Defendants respond that Sand City requested assistance from Seaside Police Department over their shared radio channel, *see* Reply at 3.

1    Virtue's SUV and drove in a "serpentine" motion, intending to prevent Virtue from passing. *Id.* at
2    70:25-71:20; 77:13-78:11. Virtue's SUV eventually came to a stop on an embankment, but the
3    parties present different accounts of the details leading up to that point. Defendants contend that
4    Virtue "attempted to overtake Officer Fernandez's vehicle on the left side," and when Virtue
5    "accelerated and attempted to pass Officer Fernandez's vehicle on the left by driving partially on
6    the center median of Fremont Boulevard . . . the right rear of [Virtue's SUV] collided with the left
7    portion of Officer Fernandez's vehicle." Mot. at 5–6. Plaintiffs contend that Defendant
8    Fernandez "rammed his vehicle into the right side of Virtue's vehicle, where an innocent
9    passenger, Jessica Fallstich was seated," and caused Virtue's SUV to lose control and come to a
10   stop. Opp. at 7. Citing the opinion by a police practices expert, Jeff Noble, Plaintiffs further
11   argue that Defendant Fernandez's "reckless tactics created the alleged danger that resulted in the
12   use of deadly force." *See* Dkt. No. 51-2, Declaration of Jeff Noble ("Noble Decl.") ¶ 8.

13   Once Virtue's SUV came to a stop on the embankment, Virtue got out and began to run
14   along the dirt embankment on the side of the road. Dashcam Video; Guzman Sanchez Expert
15   Clarification. Defendant Fernandez got out of his cruiser and pursued Virtue on foot with his gun
16   drawn and pointed in Virtue's direction. *Id.*; *see also* Dkt. No. 49-1, Declaration of Manuel
17   Fernandez ("Fernandez Decl.") ¶ 19 ("As I saw Mr. Virtue fleeing, I began to give chase on foot
18   and trained my weapon on Mr. Virtue as I did so."). The parties again contest key details of what
19   followed.

20   Defendant Fernandez attests that he could see a weighted object in Virtue's front pocket,
21   that he saw Virtue's hands go down to his waistband area, and that Virtue "outstretched his arms"
22   in his direction in what he perceived to be a "shooting posture," with a dark object that he
23   perceived to be a gun. Fernandez Decl. ¶ 18, 20. Defendant Fernandez indicates that though he
24   feared for his safety and the safety of others, he did not fire his weapon at the time because he was
25   "concerned about injuring an innocent person with an errant shot." *Id.* at ¶ 21. But Defendant
26   Fernandez details that he again saw Virtue's hands go toward his waist area and "begin to quickly
27   come up again as [Virtue] began to turn towards [him]." *Id.* at ¶ 22. According to Defendant
28   Fernandez, he then fired his weapon because he feared for his personal safety and the safety of

3

others and had a more stable platform to shoot from. *Id.*

Plaintiffs argue that Virtue's hands were completely empty the entire time he was running along the dirt embankment. Guzman Sanchez Expert Clarification at 1:07-1:10; *see also* Dkt. No. 59, Deposition of Jason Fries ("Fries Dep."), Ex. C ("Fries Expert Animation") at :37-:45; :46-1:05; 1:49-2:05; Declaration of Thomas Guzman Sanchez ("Guzman Sanchez Decl."), Ex. A ("Guzman Sanchez Expert Report") at 17:13-20. With respect to the first gesture Defendant Fernandez refers to, Plaintiffs' interpretation is that Virtue turned his body towards Defendant Fernandez, holding his hands open in a "hands up" gesture," and that Defendant Fernandez did not fire his weapon during this gesture. Guzman Sanchez Expert Clarification at 1:07; 1:43-1:47. According to Plaintiffs, Virtue completed the "hands up" gesture, and took additional steps with his hands down, facing forward and away from Defendant Fernandez, when Defendant Fernandez fired one shot and struck Virtue in the lower left back area. *Id.* at 1:07-09; 1:43-1:47; Lessem Decl., Ex. L ("NATIVIDAD Medical Records") at Bates 001778, 001780. Plaintiffs argue that Virtue never brought his hands together, never locked his elbows, and never turned his body towards Defendant Fernandez a second time as Defendant Fernandez describes. *See* Guzman Sanchez Expert Clarification at 1:07-09; 1:45-1:47. Plaintiffs contend that the defense expert's animation demonstrates that Defendant Fernandez had "a clear and unobstructed view of Mr. Virtue's empty hands before shooting him." *See* Fries Expert Animation at 1:02; 1:49-2:05. Plaintiffs also note that no one else is in the camera frame of the dashcam video, and contend that Virtue's efforts to run away did not pose any danger to anyone. *See* Guzman Sanchez Expert Clarification at 1:00-1:10.

Plaintiffs also challenge other aspects of Defendant Fernandez's account. Defendant Fernandez attests that he immediately recognized Virtue when he got out of his vehicle. Fernandez Decl. ¶ 17. Though Defendant Fernandez had not had any contact with Virtue before the day of the incident, Defendant Fernandez believes that he was shown a picture of Virtue and that other officers had informed him of Virtue's history of domestic violence, drug and firearm-related charges, and fighting with the police. *See* Fernandez Decl. ¶ 17; Fernandez Dep. at 94:17-95:4; 95:18-96:11; 96:20-100:17. Additionally, Defendant Fernandez believes he told Virtue to

4

stop and later yelled "[g]un, gun, gun, gun" when he saw a dark object in Virtue's pocket that he perceived to be a gun. *See* Fernandez Dep. at 89:6-9; 90:17-22; 101:16-20; 102:18-103:1; Fernandez Decl. ¶ 18. But Plaintiffs contend that the audio recording from the dashcam demonstrates that Defendant Fernandez did not give any commands to Virtue or any warning that deadly force would be used. Guzman Sanchez Expert Clarification at 1:00-1:10. Plaintiffs further contend that the expert clarification and analysis of the dashcam audio instead demonstrates that Defendant Fernandez said "You'd rather be running?," and that Virtue responded by stating, "Don't shoot officer. I'm not armed." Guzman Sanchez Expert Report at 12:12-13; 16:15-16.

What Plaintiffs say Virtue said was true: it is undisputed that he was not actually armed during the foot pursuit or when he was shot. Following the shooting, a tool battery was found in Virtue's sweatshirt pocket. Dkt. No. 63-3 at 78:14-79:25; *see also* Palado Dep. at 79:23-25.

Virtue suffered a complete spinal cord injury resulting in paraplegia in the shooting. NATIVIDAD Medical Records at Bates 001798, 001810. On January 30, 2019, Virtue's doctor told him that stem cell research would not provide any help in his lifetime. Lessem Decl., Ex. G at 97:22-98:9. On February 19, 2019, Virtue took his own life. *See id.* at 88:1-4; Dkt. No. 51-3 ¶ 9.

## II. LEGAL STANDARD

Summary judgment is proper when a "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is "genuine" if there is evidence in the record sufficient for a reasonable trier of fact to decide in favor of the nonmoving party. *Id.* The Court views the inferences reasonably drawn from the materials in the record in the light most favorable to the nonmoving party, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88 (1986), and "may not weigh the evidence or make credibility determinations," *Freeman v. Arpaio*, 125 F.3d 732, 735 (9th Cir. 1997), *overruled on other grounds by Shakur v. Schriro*, 514 F.3d 878, 884–85 (9th Cir. 2008).

The moving party bears both the ultimate burden of persuasion and the initial burden of producing those portions of the pleadings, discovery, and affidavits that show the absence of a

genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Where the moving party will not bear the burden of proof on an issue at trial, it "must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102 (9th Cir. 2000). Where the moving party will bear the burden of proof on an issue at trial, it must also show that no reasonable trier of fact could not find in its favor. *Celotex Corp.*, 477 U.S. at 325. In either case, the movant "may not require the nonmoving party to produce evidence supporting its claim or defense simply by saying that the nonmoving party has no such evidence." *Nissan Fire & Marine Ins. Co.*, 210 F.3d at 1105. "If a moving party fails to carry its initial burden of production, the nonmoving party has no obligation to produce anything, even if the nonmoving party would have the ultimate burden of persuasion at trial." *Id.* at 1102–03.

"If, however, a moving party carries its burden of production, the nonmoving party must produce evidence to support its claim or defense." *Id.* at 1103. In doing so, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co.*, 475 U.S. at 586. A nonmoving party must also "identify with reasonable particularity the evidence that precludes summary judgment." *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996). If a nonmoving party fails to produce evidence that supports its claim or defense, courts enter summary judgment in favor of the movant. *Celotex Corp.*, 477 U.S. at 323.

**III. ANALYSIS**

Plaintiffs allege various state law claims and violations of Section 1983 for (1) excessive force in violation of the Fourth Amendment, (2) deprivation of substantive due process in violation of the Due Process clause of the Fourteenth Amendment, and (3) municipal liability for unconstitutional custom or policy under *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1989).[2] *See*

---

[2] Plaintiffs also allege a wrongful death action under Section 1983, *see* Compl. ¶¶ 75–84. To the extent Plaintiffs are attempting to state a Section 1983 claim separate from the excessive force claim, they do not cite any federal authority or otherwise address this claim in their opposition, and the Court knows of no authority supporting such a theory. *See Neuroth v. Mendocino Cty.*,

6

Dkt. No. 1 ("Compl.") ¶¶ 34–123. Defendants move for summary judgment as to all of Plaintiffs' causes of action. Defendants argue that Plaintiffs' Section 1983 claims against Defendant Fernandez and Defendant Pridgen fail because they acted reasonably, Plaintiffs fail to demonstrate the existence of a constitutional violation, and they are entitled to qualified immunity.[3] Mot. at 9. Defendants argue that Plaintiffs' *Monell* claim fails because there is no evidence of an official policy, practice or custom that caused a deprivation of civil rights. *Id.* The Court **GRANTS** Defendants' motion as to all federal claims and declines to exercise supplemental jurisdiction over the remaining state law claims.

### A. Excessive Force

With respect to Plaintiffs' excessive force claim, Defendants argue that Defendant Fernandez is entitled to qualified immunity. Mot. at 15–16; Reply at 2–4. The doctrine of qualified immunity protects "government officials . . . from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). "Qualified immunity gives government officials breathing room to make reasonable but mistaken judgments about open legal questions. When properly applied, it protects 'all but the plainly incompetent or those who knowingly violate the law.' " *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

A court considering a claim of qualified immunity makes a two-pronged inquiry: (1) whether the plaintiff has alleged the deprivation of a constitutional right, and (2) whether such right was clearly established at the time of the deprivation. *See Pearson v. Callahan*, 555 U.S. 223, 232 (2009) (citing *Saucier v. Katz*, 535 U.S. 194, 201 (2001)). The court may exercise its

---

No. 15-CV-03226-NJV, 2016 WL 379806, at *4 (N.D. Cal. Jan. 29, 2016) (noting that "there is no 'wrongful death' claim under § 1983"). In any event, the Court finds that Defendant Fernandez would be entitled to qualified immunity as to any such claim, because Plaintiffs point to no case law showing that the asserted federal right was clearly established at the time of the shooting (or ever). The qualified immunity legal standard is discussed in Section III(A) *infra*.

[3] Plaintiffs alleged a Section 1983 claim against Defendant Pridgen for failure to supervise and train. Compl. ¶ 64. But Plaintiffs conceded at the hearing that they did not present evidence supporting any Section 1983 claim against Defendant Pridgen. The Court thus **GRANTS** Defendants' motion for summary judgment as to Defendant Pridgen on all federal claims.

7

discretion in deciding which prong to address first, in light of the particular circumstances of each case. *Id.* at 236 (noting that while the *Saucier* sequence is often appropriate and beneficial, it is no longer mandatory). "[U]nder either prong, courts may not resolve genuine disputes of fact in favor of the party seeking summary judgment," and must, as in other cases, view the evidence in the light most favorable to the nonmovant. *Tolan v. Cotton*, 572 U.S. 650, 656 (2014).

Plaintiffs allege that Defendant Fernandez used excessive force in violation the Fourth Amendment. This claim is reviewed under the Fourth Amendment's "objective reasonableness" standard. *Graham v. Connor*, 490 U.S. 386, 388 (1989). To evaluate the reasonableness of Defendant's actions, the Court "must balance the severity of the intrusion on the individual's Fourth Amendment rights against the government's need to use force." *Newmaker v. City of Fortuna*, 842 F.3d 1108, 1116 (9th Cir. 2016). The Ninth Circuit employs a three-step analysis:

> First, [the Court] must assess the severity of the intrusion on the individual's Fourth Amendment rights by evaluating the type and amount of force inflicted. Even where some force is justified, the amount actually used may be excessive. Second, [the Court] evaluate[s] the government's interest in the use of force. Finally, [the Court] balance[s] the gravity of the intrusion on the individual against the government's need for that intrusion.

*Glenn v. Washington Cty.*, 673 F.3d 864, 871 (9th Cir. 2011) (internal quotations and citations omitted). "A desire to resolve quickly a potentially dangerous situation is not the type of governmental interest that, standing alone, justifies the use of force that may cause serious injury." *Deorle v. Rutherford*, 272 F.3d 1272, 1281 (9th Cir. 2001).

Viewing the evidence in the light most favorable to Plaintiffs, the Court first finds that they have shown a triable issue of fact as to whether Virtue was deprived of a constitutional right. A jury could reasonably conclude that the alleged intrusion on Virtue's Fourth Amendment rights, measured by the "type and amount of force inflicted," was substantial. *Id.* at 1279. Plaintiffs point to evidence that Defendant Fernandez shot Virtue in the back when Virtue "was facing away from Fernandez, [with] his arms down by his side and his hands were completely empty." Opp. at 15–16; Guzman Sanchez Expert Clarification at 1:07-1:10; Guzman Sanchez Expert Report at 16:11-17:20. Plaintiffs further contend, based on the dashcam footage, that Virtue never brought his hands together and never locked his elbows or turned his body towards Defendant Fernandez a

8

second time, and that Defendant Fernandez failed to give any commands to Virtue or give any warning that deadly force would be used. Guzman Sanchez Expert Clarification at 1:00-1:10; 1:45-1:47; Guzman Sanchez Expert Report at 12:12-13; 16:15-16. Plaintiffs note that Defendant Fernandez asked Virtue, "You'd rather be running?," demonstrating that Defendant Fernandez could have given a warning. Guzman Sanchez Expert Report at 12:12-13; 16:15-16. Viewing the evidence in the light most favorable to Plaintiffs, and resolving any disputes of fact in their favor, the Court finds that a jury could reasonably conclude Defendant Fernandez used significant force when he shot Virtue in the back, without warning, while Virtue was running away empty-handed with his arms by his side. That jury also could find that these facts amounted to an excessive and unjustified use of force that violated Virtue's rights.

Defendant Fernandez's asserted interest in the use of force is that he was reacting to a gesture that he perceived as a threat. Mot. at 12–13. However, "a simple statement by an officer that he fears for his safety or the safety of others is not enough; there must be objective factors to justify such a concern." *Deorle*, 272 F.3d at 1281. Noting that no one else was in the camera frame of the dashcam video, Plaintiffs argue that Virtue's efforts to run away did not pose any potential danger to any officer or civilian. Guzman Sanchez Expert Clarification at 1:00-1:10; *see also* Noble Decl. ¶ 13. Defendants point to Virtue's attempt to evade arrest, Virtue's "threatening gestures," Defendant Fernandez's "immediate" recognition of Virtue as someone with "a history of violent contacts with police and fire-arm related offenses," Defendant Fernandez's observation of a weighted object in Virtue's pocket, the surrounding "heavily populated urban area," and Virtue's "purposeful colli[sion]" with Defendant Fernandez's cruiser that amounted to "assault with a deadly weapon." Mot. at 12–15.

Plaintiffs' evidence, including video of the pursuit and incident, calls some of Defendants' characterization into question. *See e.g.*, Guzman Sanchez Expert Clarification at 1:00-1:10. First, there is a factual dispute regarding whether Defendant Fernandez knew who Virtue was or what criminal history he had. The record reflects that Defendant Fernandez had not had any contact with Virtue prior to the day of the incident, but Defendant Fernandez says he believes that he was shown a picture of Virtue and that other officers had informed him of Virtue's history of domestic

9

United States District Court
Northern District of California

1  violence, drug and firearm-related charges, and fighting with the police. *See* Fernandez Decl. ¶

2  17; Fernandez Dep. at 94:17-95:4; 95:18-96:11; 96:20-100:17. In light of the circumstances, a

3  jury easily could find Defendant Fernandez's story not credible. Second, there is a factual dispute

4  regarding whether Virtue turned his body towards Defendant Fernandez a second time as

5  Defendant Fernandez describes. *See id.* at 1:07-09; 1:43-1:47. In analyzing the dashcam video,

6  Plaintiffs' expert contends that the video shows Virtue was not facing Defendant Fernandez at the

7  time of the shooting. Guzman Sanchez Expert Report at 16:1-4. Accordingly, when balancing the

8  nature of the intrusion against Defendant Fernandez's asserted need for that intrusion, the Court

9  finds that, viewing the evidence in the light most favorable to Plaintiffs, and resolving any

10 disputes of fact in their favor, Plaintiffs have shown at least a triable issue of fact as to whether

11 Defendant Fernandez deprived Virtue of a constitutional right.[4]

12 Under the second prong of the qualified immunity inquiry, "[a]n officer 'cannot be said to

13 have violated a clearly established right unless the right's contours were sufficiently definite that

14 any reasonable official in [his] shoes would have understood that he was violating it.' " *City &*

15 *Cty. of San Francisco, Calif. v. Sheehan*, 135 S. Ct. 1765, 1774 (2015) (quoting *Plumhoff v.*

16 *Rickard*, 572 U.S. 765, 778 (2014)). While this does not "require a case directly on point, [ ]

17 existing precedent must have placed the statutory or constitutional question beyond debate."

18 *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011). The Supreme Court has "repeatedly told courts . . .

19 not to define clearly established law at a high level of generality." *Id.* at 742. And the Supreme

20 Court has further instructed that, where "the result depends very much on the facts of each case . .

21 . officers are entitled to qualified immunity unless existing precedent 'squarely governs' the

---

[4] Defendants contend that Defendant Fernandez's decision to use deadly force was "entirely reasonable under the totality of circumstances," characterizing *Scott v Harris*, 550 U.S. 372 (2007), as a factually analogous case holding that a police officer's actions in attempting to stop a fleeing motorist were reasonable. DSupp. at 15. In *Scott*, the United States Supreme Court found that a videotape capturing the events underlying the plaintiff's excessive force claim contradicted his version of events such that no reasonable jury could believe him, and thus viewed the facts in the light depicted by the videotape. *Id.* at 378–84. In doing so, the *Scott* Court held that it was clear that the defendant did not violate the Fourth Amendment. *Id.* at 381. But the video recording in this case is readily subject to more than one interpretation, particularly in light of the bushes obstructing the view of Virtue at the time of the shooting. Accordingly, the Court finds *Scott* inapposite.

10

specific facts at issue." *Nicholson v. City of Los Angeles*, 935 F.3d 685, 695 (9th Cir. 2019) (citing *Kisela v. Hughes*, 138 S. Ct. 1148, 1153 (2018)); s*ee also City of Escondido v. Emmons*, 139 S. Ct. 500, 504 (2019) ("[W]e have stressed the need to identify a case where an officer acting under similar circumstances was held to have violated the Fourth Amendment. . . . While there does not have to be a case directly on point, existing precedent must place the lawfulness of the particular [action] beyond debate.") (internal quotations omitted and brackets in original).

Plaintiffs contend that Defendant Fernandez's use of deadly force was contrary to established law set out in *Tennessee v. Garner*, 471 U.S. 1, 11 (1985), which held that "an officer can only use deadly force to effect the arrest of a fleeing felon if, under the circumstances, he reasonably believed such force was necessary to protect himself or others from death or serious physical harm." PSupp. at 1 Plaintiffs argue that at the time of the shooting, existing precedent clearly established that it is a "Fourth Amendment violation to shoot a person who is unarmed and poses no threat of serious bodily injury or death." Opp. at 19. In arguing that existing precedent placed the unlawfulness of Defendant Fernandez's actions beyond dispute, Plaintiffs cite *Garner* and five other cases: *Longoria v. Pinal County*, 873 F.3d 699 (9th Cir. 2017), *Cruz v. Anaheim*, 765 F.3d 1067 (9th Cir. 2014), *Landeros v. City of Tustin*, 837 F.3d 1005 (9th Cir. 2016), *Curnow v. Ridgecrest Police*, 952 F.2d 321 (9th Cir. 1991), and *Estate of Lopez v. Gelhaus*, 871 F.3d 998 (9th Cir. 2017). *See id.* at 6–15.

Here, because the legality or illegality of Defendant Fernandez's actions depends very much on the facts, Plaintiffs must identify precedent that "squarely governs" the specific facts at issue. *See Nicholson*, 935 F.3d at 695. Looking to the facts of this case, the Court cannot say that any reasonable officer in Defendant Fernandez's position would have known "beyond debate," based on any case cited by Plaintiffs, that he was violating the Constitution. None of those cases involved a suspect who continued to flee on foot following a vehicle collision, or presented sufficiently similar facts so as to place the lawfulness of Defendant Fernandez's actions beyond debate. *See*, *e.g.*, *Garner*, 471 U.S. at 3–4, 21 (officer with no basis to believe burglary suspect was armed shot suspect in the back of the head as suspect climbed over a fence); *Curnow*, 952 F.2d at 322–23 (officers broke down door of suspect's home and officer "stationed at the window"

11

shot suspect inside his home and a second time as he exited his home with his gun). The cases cited that involved vehicle collisions ended with the suspect inside or near the vehicle and presented markedly different facts, including conduct that potentially reflected an intention to surrender or comply with an order. *See Longoria*, 873 F.3d at 705 (officer shot and killed unarmed suspect, who was surrounded by law enforcement officers and "in the process of putting his hands over his head reflexively or in an effort to surrender" after being tased and shot with bean bags); *Cruz*, 765 F.3d at 1078–80 (officers surrounding suspect with guns draw shot suspect after suspect opened car door). And other cases involved no attempt to flee at all. *See Landeros*, 837 F.3d at 1009, 1011–12 (officer responding to domestic dispute drove up to suspect who was on foot and quickly resorted to use of deadly force after suspect complied with command to remove his hand from his pocket); *Lopez*, 871 F.3d 1002–04 (officer shot teen-aged suspect who was walking in the direction away from the officers with a toy gun that looked like an AK-47 in broad daylight); *see Graham*, 490 U.S. at 396 (noting that "whether [a plaintiff] is actively resisting arrest or attempting to evade arrest by flight" is relevant in assessing the "totality of the circumstances" preceding an officer's use of force).

The Court finds that none of these cases squarely govern the specific facts at issue under the standard required by the Supreme Court. As previously noted, the qualified immunity standard is exacting, "protect[ing] 'all but the plainly incompetent or those who knowingly violate the law.'" *Ashcroft*, 563 U.S. at 743 (quoting *Malley*, 475 U.S. at 341). Accordingly, the Court is compelled to find that Defendant Fernandez is entitled to qualified immunity, and **GRANTS** Defendants' motion for summary judgment as to the excessive force claim.

In reaching this conclusion, the Court notes that there is much about this shooting that would benefit from a jury's careful assessment and judgment, including Defendant Fernandez's decision to fire in the direction of a high-school athletic field, within a matter of seconds and while on the run, and his questionable claim to have immediately identified the suspect as a violent felon despite never having seen him in person before. As the Ninth Circuit has explained, excessive force cases "almost always turn on a jury's credibility determinations," such that summary judgment on that issue should be granted "sparingly." *Smith v. City of Hemet*, 394 F.3d 689, 701

12

(9th Cir. 2005). But the qualified immunity standard routinely precludes federal juries of the plaintiff's and defendant's peers from evaluating the conduct of police officers, even where, as here, a shooting results in paralysis or even death. This rule thus negates the critical role of juries in assessing the reasonableness of lethal force applied in the community's name. As Judge Molloy of the District of Montana has aptly explained:

> The jury of any given community in our federal system plays a significant constitutional role. When violence occurs, whether prosecuted by the state or claimed as a violation of the constitutional prohibition against the use of excessive force, the community should have a role. . . . Part of that role is based on a community's judgment of the propriety and extent of force that is justifiable.

*Brawley v. Punt*, 186 F.Supp.3d 1102, 1107 (D. Montana 2016).

The current state of the qualified immunity doctrine thus imposes very significant costs on American communities. This Court admits to having "strong doubts" about the application of that doctrine in cases like this one, paralleling the conclusion recently reached by a Justice of the United States Supreme Court. *See Baxter v. Bracey*, --- U.S. ----, 140 S. Ct. 1862, 1865, 207 L. Ed. 2d 1069 (2020) (Thomas, J., dissenting from denial of certiorari). Because, as noted below, the Court declines supplemental jurisdiction over the state law claims (to which qualified immunity does not apply), perhaps a California state court jury will someday have the opportunity to serve this vital community oversight function as to those claims.

**B.    Substantive Due Process**

Defendants also move for summary judgment on Plaintiffs' Fourteenth Amendment substantive due process claim against Defendant Fernandez. "Parents and children may assert Fourteenth Amendment substantive due process claims if they are deprived of their liberty interest in the companionship and society of their child or parent through official conduct." *Lemire v. California Dep't of Corr. & Rehab.*, 726 F.3d 1062, 1075 (9th Cir. 2013) (citation omitted). "[O]nly official conduct that 'shocks the conscience' is cognizable as a due process violation." *Porter v. Osborn*, 546 F.3d 1131, 1137 (9th Cir. 2008) (quoting *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998)). "Where actual deliberation is practical, then an officer's 'deliberate indifference' may suffice to shock the conscience." *Hayes v. Cty. of San Diego*, 736 F.3d 1223, 1230 (9th Cir. 2013). "To act with deliberate indifference means to make a conscious choice to

13

1  disregard the consequences of one's acts or omissions." *Tatum v. Moody*, 768 F.3d 806, 813 (9th

2  Cir. 2014). "On the other hand, where a law enforcement officer makes a snap judgment because

3  of an escalating situation, his conduct may be found to shock the conscience only if he acts with a

4  purpose to harm unrelated to legitimate law enforcement objectives." *Hayes*, 736 F.3d at 1230

5  (citation omitted); *see also Tatum*, 768 F.3d at 821 (noting examples of circumstances where

6  "[d]eliberation is impractical" include "chasing a fleeing suspect or responding to gunfire in

7  crowded public spaces").

8  Plaintiffs have not met their burden to show a triable issue of fact as to whether Defendant

9  Fernandez's conduct shocked the conscience under either standard. Additionally, Defendant

10  Fernandez is entitled to qualified immunity because there was no clearly established law that

11  would have placed him on notice that his conduct violated the Fourteenth Amendment. *See T.D.P.*

12  *v. City of Oakland*, No. 3:16-CV-04132-LB, 2019 WL 913840, at *18 (N.D. Cal. Feb. 24, 2019)

13  (finding plaintiffs failed to meet either standard and noting that "[i]n any event, the defendants

14  [were] entitled to qualified immunity"); *see also Rivera v. Cater*, No. 218CV00056WBSEFB,

15  2019 WL 5102287, at *5 (E.D. Cal. Oct. 11, 2019) (finding defendants were entitled to qualified

16  immunity because "just as there was no clearly established law to put the officers on notice that

17  their conduct was violative of the Fourth Amendment, there was even less law to even suggest that

18  their conduct violated the Fourteenth Amendment right to familial association"). Accordingly, the

19  Court **GRANTS** the motion for summary judgment as to the substantive due process claim.

20  **C.** ***Monell***

21  Defendants argue that Plaintiffs' Section 1983 *Monell* claim against Defendant City of

22  Seaside fails as a matter of law. Mot. at 9. A municipality is not subject to § 1983 liability based

23  on a theory of respondeat superior. *See Monell*, 436 U.S. at 691. To establish municipal liability

24  under *Monell*, a plaintiff must show that his injury was caused by an official policy or custom.

25  *See id.* at 694. A plaintiff can establish the existence of a municipal policy in three ways: "by

26  showing that the alleged violation in question was committed by the employee pursuant to a

27  longstanding practice or custom; by showing that the employee causing the violation in question

28  has 'final policymaking authority;' or by showing that the employee causing the violation had his

14

or her actions 'ratified' by the 'final policymaker.' " *Harris v. City & Cty. of San Francisco*, No. C 08-2353 PJH, 2009 WL 2421732, at *13 (N.D. Cal. Aug. 6, 2009) (citing *Christie v. Iopa*, 176 F.3d 1231, 1235–40 (9th Cir.1999); *see also Heath v. City of Desert Hot Springs*, 618 F. App'x 882, 885 (9th Cir. 2015) (same). "After proving that one of the three circumstances existed, a plaintiff must also show that the circumstance was (1) the cause in fact and (2) the proximate cause of the constitutional deprivation." *Trevino v. Gates*, 99 F.3d 911, 918 (9th Cir. 1996); *Harper v. City of Los Angeles*, 533 F.3d 1010, 1026 (9th Cir. 2008). "A single constitutional deprivation ordinarily is insufficient to establish a longstanding practice or custom." *Christie*, 176 F.3d at 1235.

Here, Plaintiff asserts a *Monell* claim based on a theory of ratification. Opp. at 29. To show ratification, Plaintiffs must show the "authorized policymakers approve a subordinate's decision and the basis for it." *Christie*, 176 F.3d at 1239 (citation omitted). "The policymaker must have knowledge of the constitutional violation and actually approve of it. A mere failure to overrule a subordinate's actions, without more, is insufficient to support a § 1983 claim." *Lytle v. Carl*, 382 F.3d 978, 987 (9th Cir. 2004). Defendant Pridgen details that he learned of the incident later that day. Dkt. No. 49-2, Declaration of Abdul Pridgen ("Pridgen Decl.") ¶ 7. On April 15, 2019, the Monterey County District Attorney's Office informed Defendant Pridgen that it concluded that Defendant Fernandez had committed no crime. *Id.* ¶ 8. The Seaside Police Department also conducted an internal investigation 1) "to determine whether Officer Fernandez had violated any Seaside PD policies on the day of the incident," and 2) "to determine whether Officer Fernandez's use of force on the day of the incident was lawful, justified and reasonable based on applicable law and Seaside PD policy." *Id.* ¶ 9. The review board that conducted the investigation "had access to reports, evidence and dashcam video pertaining to the subject incident, as well as materials generated during the DA investigation." *Id.* ¶ 10. The board concluded that there was no violation of any Seaside PD policy and that the use of force was reasonable. *Id.* ¶¶ 11–12. Here, Plaintiffs point to the conclusion of the Seaside Police Department that Defendant Fernandez's force was reasonable. Opp. at 30. Plaintiffs contend the basis for the department's conclusions included three factors: (1)" that Fernandez recognized

Virtue," (2) "that Fernandez ordered Virtue to stop," and (3) "that Virtue raised his hands in a manner that simulated pointing a firearm." *Id.*

The Court does not find Plaintiffs' evidence sufficient to create a triable issue for *Monell* liability under a ratification theory. Plaintiff must show more than a finding from an after-the fact internal investigation. *See Aguilar v. City of Los Angeles*, No. CV 17-4382-CBM-MRW, 2018 WL 6016278, at *10 (C.D. Cal. Sept. 10, 2018) (holding that "Chief of Police and Board of Commissioners' findings that Defendants' actions complied with policies . . . during a single, after-the-fact, internal investigation . . . cannot be the sole basis for a ratification claim"); *German v. Roberts*, No. CV 15-5237 BHS-DWC, 2017 WL 6547472, at *2 (W.D. Wash. Dec. 22, 2017) ("[W]hen establishing Monell liability under a ratification theory, a plaintiff must present more than just a police investigation that concludes an officer applied reasonable force."). Plaintiffs instead must point to evidence to suggest that the internal investigation "reflect[s] a policy or custom that encourages or condones the alleged underlying constitutional deprivation." *German*, 2017 WL 6547472, at *2. Plaintiffs contend that Defendant Fernandez's "deficiencies in the areas of use of excess force, credibility, and decision making" that were left unpunished "effectively ratified and encouraged" behavior that "ultimately resulted in Mr. Virtue's death."[5] Opp. at 30. But this contention is contradicted by Plaintiffs' recognition that Defendant Fernandez "was repeatedly disciplined over the course of his career with the Seaside Police Department." *Id.* at 29. The Court finds that Plaintiffs reference to Defendant Fernandez's personnel file does not create a triable issue for purposes of establishing *Monell* liability. Accordingly, the Court **GRANTS** Defendants' motion for summary judgment as to the *Monell* claim.

### D. Supplemental Jurisdiction

A district court may decline to exercise supplemental jurisdiction if it has dismissed all claims over which it has original jurisdiction. *Sanford v. MemberWorks, Inc.*, 625 F.3d 550, 561

---

[5] Defendants filed evidentiary objections to evidence that Plaintiffs submitted in opposition to the motion for summary judgment, including Defendant Fernandez's personnel file. Dkt. No. 52-1. However, Defendants' submission does not comply with Civil Local Rule 7-3(c), which requires that "[a]ny evidentiary and procedural objections to the opposition must be contained within the reply brief or memorandum." The Court **STRIKES** the evidentiary objections from the record and does not consider them for purposes of this order.

(9th Cir. 2010) (citing 28 U.S.C. § 1367(c)(3)). "[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine—judicial economy, convenience, fairness, and comity—will point toward declining to exercise jurisdiction over the remaining state-law claims." *Id.* (internal quotations and citation omitted). Having granted summary judgment as to Plaintiffs' federal claims, the Court, in its discretion, declines to assert supplemental jurisdiction over the remaining state law claims. Accordingly, the Court **DISMISSES** Plaintiffs' remaining state law claims **WITHOUT PREJUDICE**.

## IV. CONCLUSION

The Court **GRANTS** Defendants' motion for summary judgment on Plaintiffs' Section 1983 claims for excessive force, substantive due process, municipal liability, and failure to supervise and train. And the Court declines to exercise supplemental jurisdiction over the remaining state law claims and **DISMISSES** those claims **WITHOUT PREJUDICE** to Plaintiffs asserting them in state court. The Clerk is directed to enter judgment in Defendants' favor in accordance with the above and to close the case.

**IT IS SO ORDERED.**

Dated: 5/4/2021

HAYWOOD S. GILLIAM, JR.
United States District Judge